I'm Joe Bertogli, and I represent Mr. Simmons. Mr. Bertogli, we do appreciate your willingness to accept the CJA appointment. Thank you, Your Honor. And thanks for the opportunity to come to St. Louis, although I wish it were during baseball season. Could you pull the microphone over a little bit? Thank you. All right. As I said, yes, I represented Mr. Simmons at trial, and also representing him here on appeal. This appeal is unique, I believe, because it gives this court the opportunity to right a terrible injustice as it relates to the general trial rights of Mr. Simmons, connected with his Sixth Amendment right to compulsory process and to call witnesses to defend himself. That's what he tried to do. Many months in advance of trial, seven months to be exact, he learned that a co-defendant of his, who was charged in the same conspiracy, had written a letter unsolicited by him, and he had nothing to do with it. There's been no suggestion that he somehow talked him into it or got him to do it, but he wrote a long, unsolicited, notarized letter detailing the behavior of Mr. Simmons vis-à-vis his own behavior, Mr. Edwards is who I'm talking about here, relating to whether or not he was involved in a single act of delivering an amount of methamphetamine to an undercover confidential informant. And on a specific date, February 20th, February 28th, I believe, of 2020 is the date of the conspiratorial act that the government alleges qualifies Mr. Simmons to be prosecuted and convicted of conspiracy. And Mr. Edwards' notarized statement, on a number of points, refutes the allegations of the government and the testimony of the CI. In this case, it was an individual by the name of Brian Waters. And in several important respects, he says on that occasion that no transaction of methamphetamine occurred. He and Mr. Simmons merely smoked methamphetamine. Waters was there to try to buy a gun, and Mr. Simmons didn't have any guns for him to sale, for sale, and Waters was pissed about that and the fact that the two of them were just wasting his time and smoking methamphetamine in front of him. So, he also offers exculpatory evidence in favor of Mr. Simmons in his statement that Mr. Simmons was a methamphetamine user of small amounts and not any sort of distributor or involved in the distribution of any methamphetamine. Counselor, are you talking about the written statement there? Yes, his written statement. Yes, that's all we have here. I did want to ask, does the fact that it was not made under penalty of perjury affect its trustworthiness? Well, it might, except there was no analysis by the court about why it was untrustworthy. She just concluded, first of all she said, I'll take his lawyer's word that he's going to take the fifth and I don't need to talk to him, and then it's untrustworthy, but there was no analysis as is required under Eighth Circuit law to determine whether or not it was trustworthy or not. Just like you just mentioned, one of the factors that the court could have determined was making it untrustworthy was the fact that it wasn't made under the penalty of perjury. We didn't get that far because she wouldn't let me call him as a witness. I attempted to do everything I could to try to get the exculpatory evidence in favor of Mr. Simmons in front of the court and in his defense at trial and was thwarted at every junction. The argument here is number one that the court, the district court failed to make any requisite inquiry into whether or not the actual witness was going to take the Fifth Amendment or not. At the final pretrial conference, which was the Friday before trial, the court had made a determination that, and Mr. Edwards' counsel was there and said, well, I think if he's called to testify, he'll take the Fifth. But, of course, his trial counsel said, I didn't know he wrote this letter either before it was brought to his attention, by me, by the way. At any rate, the court at the pretrial said, okay, well, marshals, you can bring Mr. Simmons over to court on the second day of trial here and we'll make a record outside the presence of the jury. Fine. That's all I was asking to have done, which would have been a reasonable inquiry into whether or not the witness himself was going to take the Fifth or not. Then Monday morning, just before the trial started, the judge says, well, I've reconsidered my position on whether or not we need to call Mr. Edwards to take the Fifth or not. I'm going to rely upon what his lawyer told me on Friday. And under Washington, United States v. Washington, on an Eighth Circuit case, I'm going to determine that the record that we had about Mr. Simmons' lawyer saying he was going to take the Fifth is adequate. And, of course, she asked me for some authority that I had in absence of Washington. And I said, well, I don't have any authority for you right this minute. They didn't think that was going to happen until it happened. But I said, in all my years of practice in the Southern District, all the rest of the judges, including Judge Ronald Longstaff, Judge Harold Vietor, now deceased Judge Charles Woolley recently died a few weeks back. Their practice was, well, let's call the witness in outside the presence of the jury at the time of trial, see if he's going to take the Fifth or not, and allow the defense lawyers to ask whatever questions they wanted of the witness to see how far he was going to go. And I said, that's my authority. Well, she didn't accept that. But nonetheless, subsequently, I've analyzed Washington. And as I said in my brief, Washington was a situation where the judge actually had a colloquy with the defendant, the actual witness. The witness's lawyer in Washington also made a statement about his wanting to take the Fifth. But then the judge did actually let defense counsel examine the witness. And then when it was apparent that he was going to take the Fifth, that's when questioning stopped. So Washington was misplaced. The judge's reliance on Washington is just wrong. And this court has the opportunity to reverse that injustice and allow another trial for Mr. Simmons in which he could present evidence to defend himself. Certainly, the other issues I raised, number one, there was inadequate basis for an inquiry into whether or not the witness would actually take the Fifth Amendment. That's number one. Number two, if he did, it was my position, still is, that the court should order the government to give him immunity. They give immunity all the time to their witnesses. And certainly in the name of justice and a fair trial, the defendant ought to have the opportunity to have witnesses that have pertinent exculpatory and information that is essential to his defense to be able to offer that testimony. So I think that what I offered the court to do is to, if the court determines the witness is going to take the Fifth, make the government give him immunity. Absent that, give him judicial immunity. Say, come in and testify. You're not going to get prosecuted for anything you say under oath here, unless it's a lie. And we're not going to use that against you. In this particular case, the judge declined my invitation to, number one, order the government to give him prosecutorial immunity, and then, number two, to invoke judicial immunity. And I'm aware that judicial immunity is one of those characters that's, you know, a rare remedy and only should be given in such a circumstance where there's got misconduct by the government in trying to thwart the testimony and otherwise a violation of the defendant's right to present a defense with exculpatory information. And I think we've got that here because in this case, it's interesting that the government, when they found out about Edward's statement and my intention to call him as a witness, made a motion to move his sentencing until after Simmons' trial in November. His sentencing was originally set for July, and it got moved to December. And in their motion to continue, they said if he testifies at trial, which we think is false, in lines with his purported statement, then we're going to jerk his three-level acceptance responsibility and add two levels for obstruction of justice. Well, you know, if that isn't prosecutorial manhandling of a situation, I don't know what is. Because threatening a witness with the reduction of taking away three levels and taking away and adding two more levels, it certainly rises to the level of judicial immunity. I see I'm eating into my rebuttal time, so I'll reserve the rest of it for that. Thank you. Ms. Weimer. Good morning. We also appreciate your willingness to accept the CJA appointment. Of course. As this court is aware, Mr. Hambrick was a co-defendant with Mr. Simmons, and my task is a bit more Herculean than Mr. Bertolli's. My arguments relate to the sufficiency of the evidence used to convict Mr. Hambrick of the conspiracy to distribute controlled substances and specifically the use of cooperating witnesses, Mr. Turner and Mr. Simon, in securing that conviction. With respect to the conspiracy, as this court is aware, the state government has to prove that a conspiracy existed, that Mr. Hambrick knowingly entered into that conspiracy, and that he was aware that the conspiracy existed. Their evidence and testimony regarding that conspiracy relied primarily upon Brian Waters, a cooperating individual who was working with law enforcement. In addition to Mr. Waters' testimony, they also offered that of Special Agent Jenkins. The challenge to Mr. Waters' and Agent Jenkins' testimony is that neither of them can specify that it was Mr. Hambrick who was involved in any kind of transaction that they were alleged to have observed. Mr. Waters was in a vehicle with Leroy Williams, who was the subject of that investigation. Mr. Williams exited the vehicle that he was in with Mr. Waters and went to a vehicle that Mr. Williams claims was owned and driven by Mr. Hambrick. Neither Mr. Waters or Special Agent Jenkins saw Mr. Hambrick in that vehicle. They also don't know what happened within that vehicle. The next thing that they could have testified to is that Mr. Williams got back into a vehicle with Mr. Waters. The difficulty with that is nobody stopped Mr. Williams between vehicle A and vehicle B. We don't know that he had anything about or on his person when he left the vehicle with Mr. Waters and got into the vehicle with Mr. Hambrick. We don't know what happened in that particular vehicle, assuming Mr. Hambrick was the person in the car. The next thing we have are some phone records that indicate there may have been communications between Mr. Hambrick and Mr. Williams. We don't know what those communications consisted of. For all we know, they were talking about baseball scores, football scores, or who's picking up the kids for their next PTA meeting. The evidence and testimony that Agent Jenkins could offer is that he observed the vehicle and that later he saw that same vehicle being driven by Mr. Hambrick. But there's no indication that draws the line specifically between Mr. Hambrick providing any kind of drugs to Mr. Williams that were subsequently used in any additional transactions. The buttress to that testimony are the testimonies of Mr. Turner and Mr. Simon. Those two witnesses were working with law enforcement subsequent to the investigation. They were essentially jailhouse informants who said, hey, at some point in time in the past, I've purchased some kind of drug from Mr. Hambrick. Neither Mr. Turner or Mr. Simon could provide any kind of specific dates other than I believe the questioning to Mr. Turner was, hey, didn't you almost overdose about a month and a half before the dates alleged in this indictment? Where'd you get those drugs? But there's no evidence presented by either Mr. Turner or Mr. Simon that during the time period alleged in the indictment or the specific distribution date that Mr. Hambrick was selling anything to either of those individuals. Their testimony should have been left out and improperly excluded by the court as being unfairly prejudicial. It is not intrinsic evidence. It doesn't tie enough to the allegations within the indictment to make it anything other than inflammatory. What we have is a jury that now hears there's somebody who may or may not have been selling some kind of drugs to two other individuals. But because those people are in here saying I bought from him, it just buttresses the limited information that they have with respect to the actual surveilled interaction on April of 2020. In addition to that, we have the issue of weight. There's no weight with respect to Mr. Turner or Mr. Simon. Mr. Turner, in fact, specifically testified that he's very bad with weight. I can relate to that. I'm terrible at identifying height. Taller than me, shorter than me, fine. But I can't tell you somebody's five foot six or seven by looking at them. Mr. Turner apparently has that difficulty with determining weight. So the other issue that the testimony that Mr. Turner and Mr. Simon provided for clouding what the jury was doing is saying, well, it could have been this amount. No information on that. We have no records of the specific transactions, what the weight was, when those occurred. And by allowing that testimony in, it buttressed limited testimony that was available through Mr. Waters and Special Agent Jenkins, leading to, I believe, jury confusion and ultimately a jury verdict that Mr. Hambrick would ask this court to reverse and remand for a new trial, specifically with instructions that the testimony of Mr. Turner and Mr. Simon be excluded. I understand that I have additional time at this point. I would reserve it for any rebuttal. All right. Thank you. Thank you. Ms. Tubbs. May it please the court, Mackenzie Tubbs on behalf of the United States, and I tried this case. This court should affirm the jury's verdicts and also the district court's rulings. I'll start with the arguments raised by Mr. Simmons. The district court here properly excluded the testimony of co-defendant Edwards because he asserted his Fifth Amendment privilege. And the district court's record here made through his counsel of asserting that Fifth Amendment right was a sufficient inquiry. First, I'd like to say how different this case is from the cases raised by Mr. Simmons, Washington, and Nelson. Both of those cases involved the testimony of witnesses. Here we had these Mr. Simmons sought the testimony of Mr. Edwards, a charged co-defendant. And not only was Mr. Edwards a charged co-defendant in the conspiracy, he was also jointly charged with Mr. Simmons in the distribution count. And that matters here. The court's inquiry as to how Mr. Edwards, why he needed to assert his Fifth Amendment right here is apparent on its face when we're considering a co-defendant versus a witness off the street. Some of the cases, for example, talk about witnesses who come in and say, oh, well, I've used drugs and I'd like to now invoke my Fifth Amendment right. It is apparent on its face in seeking to call co-defendant Edwards that the substance of his testimony was going to be incriminating. He is charged in the two counts that Mr. Simmons is charged with jointly. Ms. Tubbs, it may or may not be evident on its face, but we do have the statement from Edwards' counsel. And it seems that his statement about him not being willing to testify was a little bit vague. Didn't it leave some room for Edwards to change his mind? I do not believe it did, Your Honor. But to the extent that there was any question, the assertion of the Fifth Amendment right, his lawyer did say those words, Mr. Edwards asserts his Fifth Amendment right. And that statement alone cannot be held to be an abuse of discretion by the district court here. The record made at the final pretrial conference with his attorney was rather clear. And as I've just been discussing, it's evident on its face when you read that statement purportedly from Mr. Edwards that the district court here considered twice, for two purposes rather, both in its motion, Mr. Simmons' motion to sever, and as a purported trial exhibit. When you read that letter, it is inherent, it is plain on its face that the statements Mr. Edwards was seeking to make in this case are incriminating. He admitted as part of that letter that he was attempting to connect the confidential informant with a deal for $1,600 for a QP, a quarter pound, and another three zips for $1,200. He was, of course, as Mr. Simmons sought to admit, claiming that Mr. Simmons did not sell drugs on the date in question, but he did admit that Mr. Simmons had seven grams and that Mr. Edwards and Mr. Simmons did hot rails on the day that they were with the confidential informant. This testimony was inherently incriminating, and the district court properly considered counsel's assertion that Mr. Edwards would, in fact, assert his Fifth Amendment privilege, and that was sufficient. The case law, of course, is very clear that Mr. Edwards' assertion of his Fifth Amendment right trumps Mr. Simmons' rights to compel him as a witness. And, of course, here it's also not an abuse of discretion as cited in the government's brief for the district court to rely on counsel's assertion because of the case law set forth in Warfield, which also involved a co-defendant, and it clearly stated that an assertion by counsel is sufficient. So the loose language in Nelson and Washington do not demonstrate here that any abuse of discretion, any abuse of discretion by the district court for relying on an assertion by counsel. One other point raised in Mr. Simmons' brief is that because this evidence was clearly exculpatory, that this court and the district court should have given immunity for that statement. Kaposi does not provide such a loophole for evidence that is just merely clearly exculpatory. That is one of the five factors that is discussed in the Smith case, and as, of course, as the government's brief recognizes and case law firmly sets forth, any expansion of Smith is explicitly not good law, and the cases are very firm on that point. But even if we assume that in using those Smith factors to establish some alleged due process violation, Mr. Simmons here cannot overcome the factor, the last factor, because here there is a strong government interest against immunity because Edwards' purported statement is false on its face and directly contradictory to the evidence. That is the evidence at trial, including audio from the purchase and the confidential informant's testimony. Exhibits 312, 313, and 314 all directly contradict the written statement of Mr. Edwards' purported view of the events on that day, and therefore directly, of course, open Mr. Edwards up to perjury. Let me ask you, in the sequence of events, so do I understand Edwards had pled but not been sentenced, Simmons comes up for trial, Simmons and Hamburg come up for trial, and then Edwards is sentenced after the trial. Is that kind of the sequence? Yes, loosely, Your Honor. I would say that at the time that Mr. Simmons, rather, presented this statement as part of his motion to sever, Mr. Edwards had not yet pled guilty and was, in fact, at that time set for trial jointly with Mr. Simmons. Why didn't he go to trial with Simmons? Did he enter into a plea agreement? And as part of that plea agreement, he did not make any admissions about this deal with Mr. Simmons. Well, so why didn't Edwards go to trial with Simmons and Hamburg if he hadn't entered into a plea agreement at that point? So there was an original trial setting in June, and trial was continued to November, and it was in June that Mr. Edwards had a change of heart and decided to plead guilty. I guess I'm confused. Did Edwards plead guilty before the actual trial? Yes. Yes, Your Honor. Okay, so Edwards had pled guilty before the actual trial with Simmons and Hamburg. Did his plea agreement – was his plea agreement inconsistent with the letter? There was no mention in his plea agreement of any of the transaction which was summarized in his letter. Well, was there anything in the plea agreement that was inconsistent with the letter? No. And I would like to dispel any notion here that the government then continued Mr. Edwards' sentencing in an effort to dissuade him from testifying. The government's motion to continue his sentencing, which is at docket 274, does discuss and would be disingenuous to not mention that there are obvious implications if Mr. Edwards were to testify consistent with the letter. And those statements, as just discussed, are entirely inconsistent with the evidence here. And, of course, there are implications for acceptance of responsibility and perjury as well as implications under his plea agreement. But that motion to continue by the government also noted the need to avoid transporting Mr. Edwards to the Bureau of Prisons should he choose to testify at the November trial, leaving open, of course, that possibility that he would choose to testify and go against his counsel's advice to invoke his Fifth Amendment right. The nature of Edwards' statement here, as false, is also why the district court properly excluded it as hearsay under the residual exception. As this court touched on earlier, it was a non-notarized statement. There is nothing here that corroborates its truthfulness. And it was — Well, I thought it was notarized, but it wasn't under penalty of perjury. One could say it was notarized because it stated that it was notarized. There is certainly no reason to believe that that was a proper notary here. But it certainly was not under penalty of perjury and, as I've mentioned several times, was completely contradictory to the evidence at trial. I'll move on to the issues raised by Mr. Hambrick. And here, I'll start with the issue of the two witnesses who testified about purchasing drugs from Mr. Hambrick. The argument by Mr. Hambrick ignores much of the evidence and much of their testimony. The evidence presented by these two witnesses was intrinsic. It contributed to the narrative that Mr. Hambrick sold drugs near a Walgreens driving his white SUV from around the same time as the conspiracy and during the conspiracy. Kyle Turner remembered an event in December of 2019 that changed the quantities that he was buying from Mr. Hambrick. Before, he was buying less, and after, he was buying more methamphetamine. And he testified that for 30 to 45 days, he was purchasing pounds and pounds of methamphetamine from Mr. Hambrick during the charged conspiracy. The jury also heard evidence and saw Facebook messages between Kyle Turner and Mr. Hambrick. And those messages are dated shortly before and during the conspiracy. And as Mr. Turner testified at trial, involve his drug debt to Mr. Hambrick for the pounds and pounds of methamphetamine that he was purchasing from him. Mr. Simon also remembers seeing Kyle Turner. And that is very important because it links their testimony and shows the same time of their testimony in that Mr. Hambrick was in possession of multiple pounds of methamphetamine as observed by Mr. Simon. And also that Mr. Hambrick discussed Kyle Turner's debt with Mr. Simon. This ties them temporally to the period as charged in the indictment. And of course, they presented very similar narratives about how they would obtain the methamphetamine from Mr. Hambrick. They would meet him near the same two Walgreens in his white SUV. That white SUV is important because it does, that is of course, what law enforcement observed during surveillance. And as the jury concluded, Mr. Hambrick's participation in the conspiracy and during the charge distribution was from that white SUV. Again, Mr. Hambrick's evidence as regards to, in regards to sufficiency of the evidence ignores much of the trial testimony. It ignores the testimony of Detective Carter, who was from a different vantage point than Agent Jenkins. And the still shots of Mr. Williams leaving from his car where the CI was traveling to Mr. Hambrick's white SUV and returning with something in his hand. It also ignores the subsequent surveillance that law enforcement did, identifying Terry Hambrick as the driver of that white SUV. And that identity evidence here is one of the many reasons that the jury's, that the evidence was more than sufficient to support the jury's verdict. The audio evidence here of Mr. Williams specifically references his source of supply for this deal. References the type of car that he's going to be in and references that Mr. Williams was there for more than what the CI was paying for. And of course, Mr. Hambrick's argument also overlooks the fingerprint evidence. Mr. Hambrick's fingerprints were found on the drug packaging and that demonstrates the sufficiency of the evidence here. Unless the panel has any additional questions, I will yield the rest of my time. Thank you. Thank you. Mr. Bertogli, you've got just over a minute. All right. This, the government's argument here about analyzing what was in Mr. Edwards' statement vis-à-vis what the government believes the evidence to show otherwise is beside the point. What we've got here is a trial. It's for a jury to determine and reconcile conflicting evidence, not the government or the court. That's what we're trying to do here is to present evidence and information to a jury to determine whether or not they want to use it in order to see if the burden of proof beyond a reasonable doubt has been satisfied or not. And the government's observation that his statement was contrary to other evidence that somehow makes it inadmissible and unreliable is just a circular argument which really shouldn't be entertained. The jury needs to determine and hear this evidence. In this case, it never got that far. Period. Thank you. Thank you. Ms. Weinberg. Thank you. Unless the panel has any questions for me, I will either yield my time back to the panel or cede the remaining to Mr. Bertogli if he has anything further. All right. Thank you. Thank you. But I wanted to touch on the timing of this. I think the court's aware that Edwards was a co-defendant. He pled guilty prior to Simmons' trial. I came into possession of this statement well in advance of the trial, notified all the parties about its existence. Then after its existence, the government makes a motion to continue his sentencing because they somehow think that it might affect how they argue at sentencing. If he testifies at trial, they're certainly going to argue that his three levels acceptance ought to be taken away and he had two points for obstruction of justice. Well, I believe that was an effort to dissuade Mr. Edwards from testifying. But we never got that far because nobody ever heard it from his own mouth. All he got was his lawyer's statement that, I think he's going to take the fifth. Well, you know, that was 72 hours prior to the trial starting and we weren't even going to call him as a witness until after the second day of trial. So a lot of time could have slipped between a person's decision about what to do regardless of what their lawyer advised them to do. I'm sure his lawyer didn't advise him to write that letter either. But in this case, the judge took that out of the realm of possibility by saying, we're not even going to make a record with this witness. And it doesn't make a difference whether the witness is a co-defendant or not. A witness is a witness under the cases that I've looked at, including Washington and Nelson, and the other cases having to do with the standard of inquiry that you are to engage in, in order to determine whether a witness, not the witness's lawyer, is going to take the fifth or not. Thank you. All right, thank you. Mr. Wertogli and Ms. Weimer and Ms. Tubbs, we appreciate your arguments very much and the case is submitted.